199 P.3d 991 (2008)
E. John DUNCAN, Appellant,
v.
ALASKA USA FEDERAL CREDIT UNION, INC., Respondent.
No. 61651-0-I.
Court of Appeals of Washington, Division 1.
December 29, 2008.
*994 Kara Heikkila, Hall Farley Oberrecht & Blanton PA, Boise, ID, Thaddeus O'Sullivan, Holmes Weddle & Barcott, Seattle, WA, for Respondent.
Kevin Terry Steinacker, Shane Lytle Yelish, Tacoma, WA, for Appellant.
COX, J.
¶ 1 E. John Duncan appeals an order granting summary judgment to Alaska USA Federal Credit Union ("Alaska USA"), dismissing his breach of contract and wage claim statute claims. There are genuine issues of material fact whether the employee handbook of Alaska USA promised specific treatment in specific situations and whether a bona fide dispute between the parties bars exemplary damages under the wage claim statute. But there are no genuine issues of material fact whether Alaska USA could unilaterally amend the terms of the compensation agreement between the parties. We affirm in part, reverse in part, and remand.
¶ 2 Alaska USA is a credit union that operates multiple branches in western Washington. In September 2000, Duncan began working for Alaska USA as the manager of its Kent branch. Upon being hired, Duncan acknowledged, in writing, receipt of an employee handbook that specified the terms of his performance reviews and compensation.
¶ 3 In 2003, Alaska USA created a business plan to introduce a new lending program in Washington. To facilitate the program, Alaska USA created the position of Pacific Northwest Credit Development Officer ("CDO"). Alaska USA identified Duncan for the CDO position based on his prior sales experience.
¶ 4 Following several discussions with Duncan, Alaska USA presented him with a written summary of a proposed compensation plan ("2003 Plan"). The 2003 Plan specified the basis points on new loans, bonuses, and minimum guaranteed compensation that Duncan would receive as compensation for the CDO position. The 2003 Plan also provided: "This compensation plan will be reviewed and potentially amended after one year and will be subject to such review and amendment annually thereafter."[1] Duncan agreed to take the CDO position in mid-October 2003. Alaska USA's personnel records indicate that the effective date of Duncan's transfer was November 1, 2003.
¶ 5 Duncan's efforts as CDO were successful. A September 2004 employee evaluation states that Duncan met or exceeded expectations and that "[a]s a result of [Duncan's] efforts, in a very short time the Pacific Northwest volumes have grown to become about 25% of the credit union's dealer businesses."[2] Duncan was also named employee of the year for 2004. An October 2005 evaluation states that "[d]uring the past year Pacific Northwest dealer network loan volume has grown significantly and now constitutes approximately 40 percent of total network monthly volume."[3] Both parties agree that Duncan's sales volumes, which served as the basis for his commissions, were greater than expected. Moreover, Duncan's compensation was $434,658 in 2004 alone.
¶ 6 In the fall of 2004, Alaska USA significantly amended downward Duncan's compensation scheme ("2004 Plan"). The 2004 Plan also provided: "This amended compensation plan replaces all terms and conditions of the previous compensation plan and will be subject to review and amendment semi-annually."[4]
¶ 7 Duncan received notice of this amendment by an October 5, 2004 e-mail that referenced a telephone conversation on the day before. Duncan objected but ultimately signed an agreement based on this new plan, which had an effective date of October 1, 2004.
¶ 8 At the end of March 2005, Alaska USA extended the 2004 Plan through the end of April 2005. Duncan signed this extension as well.
¶ 9 In May 2005, Alaska USA again amended Duncan's commission rate downward *995 ("2005 Plan"). The 2005 Plan was to be reviewed again in three months. Duncan again objected. Duncan also signed this agreement, which had an effective date of May 1, 2005 and was apparently signed on May 3, 2005.
¶ 10 Upon expiration of the 2005 Plan, a compensation plan with nearly identical terms was provided to Duncan with an effective date of August 1, 2005. Alaska USA successively extended the 2005 Plan to December 31, 2005, March 31, 2006, and June 30, 2006. Duncan signed these amendments as well.
¶ 11 Duncan took leave from Alaska USA under the Family Medical Leave Act. After exhausting that leave, he retired in October 2006.
¶ 12 Duncan commenced this declaratory judgment action, alleging breach of contract and violation of the wage claim statute. He seeks exemplary damages under the wage claim statute and other relief. The trial court granted Alaska USA's motion for summary judgment, dismissing the action.
¶ 13 Duncan appeals.

EMPLOYEE HANDBOOK
¶ 14 Duncan argues that there are genuine issues of material fact whether Alaska USA breached the terms of its employee handbook that promise specific treatment in specific situations. We agree.
¶ 15 We review a grant of summary judgment de novo.[5] Summary judgment is proper when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."[6] All facts and reasonable inferences are considered in the light most favorable to the party opposing summary judgment.[7] Summary judgment should be granted only if, from all of the evidence, reasonable persons could reach but one conclusion.[8] The party moving for summary judgment has the burden of proving there is no genuine issue as to any material fact.[9]
¶ 16 "Generally, an employment contract, indefinite as to duration, is terminable at will by either the employee or employer."[10] However, there are two ways in which "employers may be obligated to act in accordance with policies as announced in handbooks issued to their employees."[11] First, the employee and employer could contractually obligate themselves concerning provisions found in an employee handbook.[12] Second, even absent a contractual agreement,
if an employer, for whatever reason, creates an atmosphere of job security and fair treatment with promises of specific treatment in specific situations and an employee is induced thereby to remain on the job and not actively seek other employment, those promises are enforceable components of the employment relationship.[[13]]
¶ 17 Here, Duncan claims that Alaska USA breached the terms of its handbook when it reviewed the terms of his CDO compensation plans more frequently than annually, reducing his compensation when it did so. Specifically, Duncan cites section 4.3 of the employee handbook under the heading "Salary Adjustments." In relevant part, it states:
Salary reviews and adjustments will occur no more frequently than [annually], except if:
 an employee is assigned to a new or existing position in a different category; or

*996  a revision to an employee's job description is made resulting in the assignment of significantly more or less responsibility; or
 the scope of responsibility of an employee's position is significantly changed; or
 as market conditions warrant.[[14]]
¶ 18 Duncan argues that a genuine issue of material fact exists whether this language constitutes Alaska USA making a promise of specific treatment in specific situations, thus obligating it to review and adjust his compensation no more frequently than annually.
¶ 19 To demonstrate a breach under the specific treatment prong, a plaintiff must prove "(1) that a statement (or statements) in an employee manual or handbook or similar document amounts to a promise of specific treatment in specific situations, (2) that the employee justifiably relied on the promise, and (3) that the promise was breached."[15] "Each of these elements presents an issue of fact."[16] However, the issues may be decided as a matter of law "if reasonable minds could not differ in resolving them."[17]

Specific Treatment in Specific Situations
¶ 20 Mere "general statements of company policy" that do not "amount to promises of specific treatment" are not binding.[18] Our courts have applied this principle to different factual situations with varying results.
¶ 21 Courts have found a question of fact as to the existence of a promise for specific treatment where the language of an employee manual could be construed to require the employer to utilize a certain process or procedure.[19] For example, in Thompson v. St. Regis Paper Co.,[20] an employee who was forced to resign for "stepp[ing] on somebody's toes" relied on a handbook providing that terminations "will be processed in a manner which will at all times be fair, reasonable, and just."[21] The court also paraphrased an internal memoranda quoted by the employee as "stating termination of controllers will be discussed before the fact between the corporate controller and divisional operations managers."[22] On the record available to it, the court concluded that it was "unable to determine the effect of the manual in relation to the employment relationship...." and "whether any statements therein amounted to promises of specific treatment in specific situations."[23] The court remanded the case for further consideration.[24]
¶ 22 Similarly, in Swanson v. Liquid Air Corp.,[25] a memorandum of working conditions contained an exclusive list of five types of conduct sufficient for discharge without prior notice.[26] The memorandum also provided: "in all other instances of misconduct, at least one warning, shall be given."[27] The court held that material issues of fact remained whether the employer promised specific treatment in that situation.[28]
¶ 23 Here, the handbook language that "[salary] adjustments will occur no more frequently than [annually]" is like that described in Thompson and Swanson. Arguably, this handbook language is mandatory. *997 For example, the word "will" has been held to be mandatory, not discretionary.[29] Thus, summary judgment was improper on this basis.
¶ 24 Alaska USA argues that the handbook language is not a promise of specific performance as a matter of law. However, the cases relied upon by Alaska USA for such a holding are inapplicable here because the policy manuals either made no promise of specific treatment at all[30] or explicitly retained discretion in the employer to act as it saw fit.[31]
¶ 25 For example, in Trimble v. Washington State University.[32] a professor who had been denied tenure claimed that the university breached a faculty manual that described the tenure review process as follows: "The tenured members of the unit are expected to establish how the evaluation is to be accomplished (for example, in an open meeting, in written evaluations submitted directly to the department chair, or by other appropriate means)."[33] The court held that this language was discretionary and not a promise for specific treatment as a matter of law.[34]
¶ 26 Similarly, in Drobny v. Boeing Co.,[35] the court held that an employee was not entitled to progressive discipline procedures outlined in an employee handbook where a subsequent provision provided: "It is not always necessary ... that the discipline process... include every step. Some acts ... warrant more severe discipline on the first or subsequent offense."[36]
¶ 27 In Stewart v. Chevron Chemical Co.,[37] the court stated: "Chevron's layoff policy states only that management `should' consider performance, experience and length of service in determining the sequence of layoffs. This does not create an obligation that Chevron will or must consider all three factors. `Should' may be interpreted as discretionary...."[38] However, the Stewart court's willingness to interpret this language has been distinguished, by our supreme court, from the principles stated in Berg v. Hudesman,[39] a later case, and characterized as inconsistent with the determination in Thompson[40] that the issue is one for the trier of fact.[41]
¶ 28 We note that of the four exceptions to the salary adjustment provision, only the "market conditions" clause provides a potential basis for reviewing Duncan's compensation more frequently than annually under the circumstances of this case. But Alaska USA provides no argument in its brief suggesting that a change in market conditions was the basis for reviewing and reducing Duncan's compensation earlier than the first annual anniversary of starting the job as the CDO as of November 1, 2003. Here, his annual review and the reduction of his compensation occurred in October 2004  short of the one year anniversary of Duncan's *998 appointment to the CDO position. While deposition testimony suggests that Alaska USA considered the compensation its competitors were paying similarly situated employees as a market condition,[42] the fact remains that no evidence in the record indicates that the compensations being paid by Alaska USA's competitors had changed as of the time of the first review of Duncan as the CDO.
¶ 29 Duncan also refers to two provisions, nearly identical to one another, found in both the employee handbook and the personnel policy manual under the heading "Salary Increases."[43] The handbook provision provides in relevant part: "[a]n employee may expect a base salary increase [annually] unless the Employee Performance Evaluation reflects that the employee is not meeting or exceeding expectations."[44]
¶ 30 The parties make much of the effect of the word "may" within these provisions. However, Duncan concedes that he "has never argued that Alaska USA breached the `Salary Increases' provision of the Employee Handbook."[45] Based on this concession, it is unnecessary to address the arguments associated with the Salary Increases provisions.
¶ 31 Additionally, Duncan quotes language from a personnel policy manual that describes circumstances under which salary reductions are based.[46] However, Duncan makes no argument that this provision constitutes a promise for specific treatment in specific situations. Regardless, the inclusion of "other personnel action" as one of the grounds for salary reductions indicates that Alaska USA retains discretion such that it was not bound by those provisions.[47]
¶ 32 In sum, whether market conditions, as provided under section 4.3 of the employee handbook, warranted early review of Duncan's compensation is a genuine issue of material fact.

Justifiable Reliance
¶ 33 The next issue is "[w]hether [Duncan] justifiably relied on promises of specific treatment in specific situations[,]" a question for the trier of fact.[48]
¶ 34 Here, Duncan cites numerous sections of the record in which he made statements showing his reliance on the handbook.[49] He also points to written statements by Alaska USA itself, appearing to acknowledge that Duncan's employment was governed by the handbook.[50]
¶ 35 In response, Alaska USA points to certain deposition testimony by Duncan that it construes as an admission that he did not rely upon the handbook. But this shows the existence of material factual disputes, which are well-suited for a finder of fact, not a trial or appellate court.
¶ 36 Alaska USA cites only a United States District Court case in which the court held that an employee did not, as a matter of law, justifiably rely on an employee manual. In Rosen v. AT & T Mobility, LLC.[51] a terminated employee gave deposition testimony in which she acknowledged her at-will employment status was never altered in writing by *999 an authorized officer as required by the employee handbook.[52] The judge held that "the inconsistency between her claims of reliance and her understanding of her at-will employment status undermines each of plaintiff's claims and warrants summary judgment for defendant."[53]
¶ 37 Rosen does not control here.[54] Rosen's claim for wrongful discharge was wholly inconsistent with her own testimony that she understood she was an at-will employee. Thus, she could not claim justifiable reliance. Here, Duncan's assertion that he relied on the handbook provisions regarding annual review of compensation is a matter independent of Alaska USA's right to terminate his employment. Moreover, Alaska USA is unable to point to a single, unequivocal statement by Duncan that he did not rely on the handbook. To the contrary, Duncan offers several prior statements in which both he and Alaska USA purport to rely upon the handbook.
¶ 38 Alaska USA also argues that the use of the word "salary" in the handbook precludes Duncan's claim of reliance because Duncan acknowledged in a deposition that he was commissioned, not salaried.[55] Alaska USA's characterization of Duncan's acknowledgment is unpersuasive. We note that Duncan invites this court's attention to a deposition excerpt in which counsel for Alaska USA uses the term "salary" to refer to Duncan's total compensation including commission.[56] This serves to illustrate that even the parties use the term salary and commission interchangeably. We see no reason to reach a different conclusion about the use of these words.
¶ 39 In sum, whether Duncan justifiably relied upon the handbook's provision for annual compensation reviews is another genuine issue of material fact.
¶ 40 Duncan argues that he is entitled to enforce provisions of the handbook because the handbook was never modified during the entire course of his employment as CDO. He also claims he was entitled to receive reasonable prior notice of changes to the frequency of his reviews and compensation changes. Neither argument is persuasive.
¶ 41 Relying on Govier v. North Sound Bank,[57] Duncan claims that so long as Alaska USA did not amend its handbook, he was entitled to rely on its provisions regarding frequency of review and compensation adjustments. Noting that the credit union did not amend its handbook during the entire time he occupied the CDO position, Duncan claims that he is entitled to benefit from its provisions for that entire term. Govier does not support this contention.
¶ 42 There, a former bank employee claimed that she was terminated in violation of the bank's employee handbook after she refused to sign a new employment agreement.[58] In discussing the ability of employers to unilaterally amend employment policies, the court noted:
Although the bank's policies regarding benefits and job security were legally enforceable, its obligations existed only while its policies were in effect. When the Bank changed the duration of Govier's employment from an indefinite period to one year, and eliminated vacation leave and sick and holiday pay, the former contract terms were no longer enforceable.[[59]]
The court affirmed summary judgment in *1000 favor of North Sound Bank.[60]
¶ 43 Here, the employee handbook provision regarding annual salary review was unchanged throughout Duncan's employment with Alaska USA. However, assuming that provision was legally enforceable, Alaska USA's obligations existed only while the provision was in effect. When the 2004 Plan altered the frequency with which Alaska USA would review Duncan's CDO commission scheme, the handbook provision regarding annual salary review was no longer enforceable in that respect. Nothing in Govier suggests that an individual employee cannot contractually obligate himself to terms different from those in an employee handbook. Duncan did just that when he signed the 2004 Plan and the subsequent extensions and amendments to it. Duncan cannot now claim that each of those agreements was in violation of the employee handbook.
¶ 44 Duncan next argues, relying again on Govier. that the amendments to his CDO commission scheme are unenforceable because he was not given reasonable prior notice. There is no requirement for reasonable notice to be prior notice.
¶ 45 "An employer may unilaterally amend or revoke previously established policies and procedures as long as the employee receives reasonable notice of the change."[61] A change in the employer's policy is effective upon "reasonable notice" to affected employees.[62] "Actual notice is reasonable notice."[63]
¶ 46 Here, Duncan, as an affected employee, was provided with the 2004 Plan and the subsequent extensions and amendments to it, each of which specifically indicated that Duncan's CDO compensation scheme would be reviewed more frequently than annually. Duncan's signature on each of these documents demonstrates that he had actual, and therefore reasonable, notice that the employee handbook provision regarding annual salary review did not apply to him. Thus, the 2004 Plan and the subsequent extensions and amendments to it are enforceable despite the fact that the employee handbook remained unchanged.
¶ 47 In sum, Duncan received reasonable notice of the 2004 Plan and the subsequent extensions and amendments to it. It is irrelevant that the employee handbook was unchanged during the term of his employment.

Disclaimer
¶ 48 Alaska USA argues that disclaimer language associated with its handbook negates any claim of reliance on Duncan's part. This too is unpersuasive.
¶ 49 "[A]n employer's inconsistent representations and conduct may negate or override a disclaimer...."[64] Whether this has occurred is generally an issue of fact.[65]
¶ 50 Here, Duncan points to a letter he received from Alaska USA's executive Vice President in 2005 that stated: "As you know, the terms of your employment, as well as that of all Alaska USA employees, are clearly and completely documented in the credit union's Employee Handbook and its Personnel Policy Manual."[66] Viewed in the light most favorable to Duncan, this language suggests that Alaska USA represented in the past that the handbook governed his employment relationship, despite the disclaimer.
¶ 51 Alaska USA argues that the disclaimer language in its handbook is not properly before this court because a copy of the handbook is not in this record. Yet Alaska USA quoted the disclaimer language from the acknowledgment that Duncan signed when first hired. If the credit union believed the handbook should have been in the record, it *1001 should have put it there when arguing below. We fail to see the significance of the location of the disclaimer language. Rather, the issue is whether the language is effective to avoid creating obligations that the employer must honor.
¶ 52 Alaska USA also argues that Duncan did not sufficiently argue the disclaimer issue below. In his response to Alaska USA's motion for summary judgment, Duncan, in a single sentence, noted "[a]n employer's disclaimer that employee handbook polices do not affect the employment relationship can be negated by inconsistent representations and practices of the employer. [Swanson, 118 Wash.2d at 532, 826 P.2d 664]; Carlson v. Lake Chelan Community Hospital, 116 Wash.App. 718, 75 P.3d 533 (2003)."[67] No further analysis followed. On appeal, Duncan's opening brief includes more than two pages of analysis of Swanson and Carlson. In our view, the former reference is sufficient for Duncan to have preserved the issue for appeal.[68] And the more detailed analysis in the opening brief on appeal gave Alaska USA sufficient detail on which to base its response. In short, whether Alaska USA's representations or conduct overrode its disclaimer is a genuine issue of material fact.
¶ 53 Duncan first argues in his reply brief that genuine issues of material fact exist whether Alaska USA contractually obligated itself to abide by the employee handbook, as stated under the first prong of Thompson v. St. Regis Paper Company.[69] However, Duncan's opening brief only advances arguments under the specific treatment prong. Arguments first raised in a reply are generally not addressed.[70] Therefore, we do not consider Duncan's contractual argument.

NATURE OF COMPENSATION AGREEMENT
¶ 54 Duncan next argues that the 2003 Plan agreement was a binding, bilateral contract, the terms of which could not be unilaterally modified by Alaska USA without additional consideration. We disagree.

Statute of Frauds
¶ 55 We start with Duncan's response to Alaska USA's argument that the 2003 Plan agreement violated the statute of frauds. Alaska USA argues that the 2003 plan agreement is void under the statute of frauds because it is not evidenced by a writing signed by the credit union. Although Duncan asserted below that there was such a signed agreement, he has never produced a copy. For purposes of our analysis, we assume there never was such a signed agreement.
¶ 56 Under Washington's statute of frauds, "[e]very agreement that by its terms is not to be performed in one year from the making thereof . . . shall be void, unless such agreement, contract or promise, or some note or memorandum thereof, be in writing, and signed by the party to be charged therewith...."[71] A contract for continuing performance that fails to specify the intended duration is terminable at will and is therefore outside of the statute of frauds.[72] This is because it can be "performed at any time after its inception or terminated within the duration of a year...."[73]
¶ 57 The 2003 Plan agreement does not contain a fixed duration of time in which it is to be performed. Although the agreement contemplates the possibility of performance extending beyond one year, none of the *1002 terms require it. Thus, the 2003 Plan agreement is for an indefinite period, making it terminable at will and outside of the statute of frauds.

Terminable-at-Will Contract
¶ 58 It is beyond dispute that Washington law provides that "a terminable-at-will contract may be unilaterally modified."[74] To avoid the effect of this aspect of terminable-at-will employment contracts, Duncan asserts that the 2003 Plan agreement was a bilateral contract, which Alaska USA could not unilaterally amend. The record does not support this assertion.
¶ 59 "A traditional bilateral contract is formed by the exchange of reciprocal promises. The promise of each party is consideration supporting the promise of the other."[75] Modification of a bilateral contract requires a meeting of the minds as well as consideration separate from that of the original contract.[76]
¶ 60 Although Duncan characterizes the 2003 Plan agreement as a bilateral contract, that characterization is unsupported by this record. Nowhere in this record is there any evidence that could be fairly characterized as an "exchange of reciprocal promises," characterizing a bilateral contract.
¶ 61 Specifically, the record reflects that Alaska USA hired Duncan as a bank officer in September 2000. In the fall of 2003, Duncan and a credit union representative discussed the newly created position of CDO, including compensation for the position, over the course of at least two to three meetings. Duncan then accepted the position when it was offered to him.[77] This does not evidence any exchange of reciprocal promises, a requirement for a bilateral contract.
¶ 62 Duncan heavily relies on Ebling v. Gove's Cove, Inc.[78] in support of his claim that the 2003 Plan agreement was a bilateral contract between him and Alaska USA. That case does not require a different result here.
¶ 63 There, Ebling was hired by Gove's Cove and offered 20 percent of Gove's net commission on each sailboat he sold.[79] After two weeks of employment, Ebling agreed to transfer to Gove's used sailboat office on Westlake Avenue.[80] Ebling and the president of Gove's "agreed that in return for his agreement to manage the Westlake office, Ebling would receive 35 percent of all commissions generated by the Westlake Avenue office...."[81] Several months later, the president notified Ebling that his commission would be lowered.[82] Ebling sued.[83]
¶ 64 This court concluded that the agreement between those parties was a bilateral contract. It stated, "[t]here is abundant evidence that in exchange for his promise to manage the Westlake office, Ebling was promised 35 percent of all commissions...."[84] Because there was no mutual agreement, the amendment of Ebling's commissions was invalid.[85]
¶ 65 Significantly, the court did not address the question of unilateral contracts that are terminable at will. Nowhere in that opinion is there any indication that the question was even argued. Rather, the employer in that case unsuccessfully argued that *1003 Ebling was an independent contractor.[86] In short, that court's conclusion that there was a bilateral contract, without more, does not affect our determination here that the 2003 agreement between these parties was a unilateral contract.[87]

Unilateral Amendment of a Terminable-at-Will Contract
¶ 66 Accepting that the 2003 Plan agreement is terminable at will and unilateral, we must next determine whether it could be unilaterally modified. We conclude that this terminable-at-will contract is unilaterally amendable.
¶ 67 Duncan argues that a Nevada case stands for the proposition that a contract may be terminable at will, but not amendable at will. We reject this argument on the basis of Washington law to the contrary.
¶ 68 In the Nevada case of MacKenzie Insurance Agencies v. National Insurance Ass'n,[88] MacKenzie entered into an agency agreement with NIA that provided for a 15 percent commission on MacKenzie's sales.[89] The agreement also contained the following provision on termination: "This agreement shall terminate at any time (1) by either party giving the other written notice, with or without cause, and (2) immediately without notice upon cancellation, revocation, or expiration of the Agent's license issued by the State. Termination shall cancel all authority granted to the Agent."[90] NIA later sent a letter informing MacKenzie that the commission would be lowered.[91] MacKenzie sued.[92]
¶ 69 The trial court ruled "that since the relationship between MacKenzie and NIA was terminable by either party, with or without cause, the right of termination by written notice included the lesser right of imposing prospectively, changes in the conditions of the contract, including the terms of compensation."[93] The Nevada Supreme Court, in a majority opinion, overruled the trial court, reasoning that the contract continued to be binding until it was terminated in accordance with its terms.[94]
¶ 70 Citing the Washington case Mall Tool Co. v. Far West Equipment Co.,[95] the dissent in MacKenzie took the position that "[o]f necessity, the greater right in either party to terminate without cause included the lesser right to unilaterally and prospectively modify contract terms unilaterally."[96] The dissent reasoned: "NIA presented MacKenzie with a modification of the original agreement. MacKenzie simply could have refused to sell or renew NIA polices under the reduced commission rate, thus precipitating ... the termination of the agency agreement...."[97]
¶ 71 In Mall Tool, Far West's status as an exclusive distributor of Mall-Tool-brand chainsaws was effectively terminated by Mall Tool.[98] Our supreme court stated:
The agreement being terminable at will, Mall could at any time propose a modification thereof as a condition of its continuance. When a modification was proposed *1004 ... by Mall, Far West had the choice of accepting the modification or refusing to accept it, knowing that refusal would mean the termination of its exclusive distributorship agreement.[[99]]
¶ 72 Though no Washington case has expressly addressed the issue in the area of employment contracts, the rationale of the dissent in MacKenzie, which is based on this state's case of Mall Tool, states the rule that should be applied here. We see no benefit in requiring parties to a terminable-at-will contract to take the formalistic step of terminating one agreement before proposing another.[100]
¶ 73 We conclude that the trial court properly determined that the 2003 Plan agreement was properly modified because the agreement was a unilateral contract, which was terminable at will.

WILLFUL WITHHOLDING OF WAGES
¶ 74 Duncan argues that the trial court erred in dismissing his claim for exemplary (double) damages, under the wage claim statute, on summary judgment. We agree in part.
¶ 75 An employer that "[w]illfully and with intent to deprive [an] employee of any part of his wages," withholds wages that it is obligated to pay "[s]hall be guilty of a misdemeanor."[101] Additionally, such an employer "shall be liable in a civil action by the aggrieved employee ... for twice the amount of the wages unlawfully ... withheld by way of exemplary damages, together with costs of suit and a reasonable sum for attorney's fees."[102]
¶ 76 "The critical determination in a case [for exemplary damages] is whether the employer's failure to pay wages was `willful.'"[103] "The nonpayment of wages is willful when it is the result of a knowing and intentional action and not the result of a bona fide dispute."[104] A bona fide dispute is one that is "fairly debatable."[105] "An employer's genuine belief that he is not obligated to pay certain wages precludes the withholding of wages from falling within the operation of RCW 49.52.050(2) and 49.52.070."[106] "Ordinarily, the issue of whether an employer acts `willfully' for the purposes of RCW 49.52.070 is a question of fact."[107] However, where there is no dispute as to material facts, and reasonable minds could reach but one conclusion from those facts, the matter may be decided on summary judgment.[108]
¶ 77 Here, we have concluded that the claim for breach of the handbook provision that states that "adjustments will occur no more frequently than [annually]" was improperly dismissed because there are genuine issues of material fact for that claim. *1005 Accordingly, summary judgment on exemplary damages is also premature in part.
¶ 78 The record is insufficient to determine whether there is a bona fide dispute between the parties regarding compensation adjustments during the first year after Duncan's change in position to CDO. Specifically, a portion of the record indicates that annual reviews for Duncan were to be done on the annual anniversaries of his initial employment in September 2000.[109] Yet the 2003 Plan agreement suggests a different measure for the time of annual reviews. On remand, the trier of fact must determine whether these facts give rise to a bona fide dispute between the parties, assuming the court first determines that there was a breach of an obligation arising from the employee handbook.
¶ 79 In contrast, the record is sufficiently clear for this court to determine that Duncan and Alaska USA had a bona fide dispute over whether the credit union was permitted to compensate Duncan according to subsequent amendments of the 2003 Plan after October 2004. Each subsequent amendment, beginning with the 2004 Plan, was signed by Duncan and provides for the next occasion upon which Alaska USA could review and amend Duncan's compensation. These agreements indicate that Duncan was willing to work, under protest, at the stated rates of compensation and have his compensation reviewed more frequently than provided in either the 2003 Plan agreement or the handbook. That, coupled with Duncan's continued employment, serves to show that a bona fide dispute existed for those periods. Thus, summary judgment was correct in that exemplary damages could not be sought for any commissions earned by Duncan after October 2004.
¶ 80 Alaska USA argues that no exemplary damages are warranted because Duncan conceded the existence of a bona fide dispute. We disagree.
¶ 81 In the context of a request for declaratory judgment, Duncan's complaint states "[t]here is an actual, present and existing dispute, or the mature seeds of one, regarding Duncan's compensation for his services."[110] This statement is obviously for the purpose of meeting pleading requirements for this declaratory judgment action. It has nothing to do with the separate question whether a bona fide dispute exists for purposes of the wage claim statute.
¶ 82 Alaska USA also argues that no exemplary damages are warranted because "[a] finding of intentional nonpayment by a party [that] is not an individual requires the organization to reach a consensus regarding the action [to be] taken."[111] According to Alaska USA, Duncan did not present any evidence of consensus within Alaska USA to support a finding of willful nonpayment. We disagree.
¶ 83 Duncan cites deposition testimony by Alaska USA's executive vice president and chief operating officer indicating that decisions about Duncan's compensation were reached with input from managers and officers. This is sufficient to show consensus.
¶ 84 We affirm in part, reverse in part, and remand for further proceedings.
We concur: LAU, J., and DWYER, A.C.J.
NOTES
[1] Clerk's Papers at 184.
[2] Clerk's Papers at 194.
[3] Clerk's Papers at 222.
[4] Clerk's Papers at 196.
[5] City of Sequim v. Malkasian, 157 Wash.2d 251, 261, 138 P.3d 943 (2006).
[6] CR 56(c).
[7] Mulcahy v. Farmers Ins. Co. of Wash., 152 Wash.2d 92, 98, 95 P.3d 313 (2004).
[8] Vallandigham v. Clover Park School Dist. No. 400, 154 Wash.2d 16, 26, 109 P.3d 805 (2005).
[9] Id.
[10] Thompson v. St. Regis Paper Co., 102 Wash.2d 219, 223, 685 P.2d 1081 (1984).
[11] Id. at 229, 685 P.2d 1081.
[12] Id. at 228-29, 685 P.2d 1081.
[13] Id. at 230, 685 P.2d 1081.
[14] Clerk's Papers at 236 (emphasis added).
[15] Korslund v. DynCorp Tri-Cities Servs., 156 Wash.2d 168, 184-85, 125 P.3d 119
[16] Id. at 185, 125 P.3d 119 (citing Swanson v. Liquid Air Corp., 118 Wash.2d 512, 525, 826 P.2d 664 (1992); Thompson, 102 Wash.2d at 233, 685 P.2d 1081).
[17] Id. at 185, 125 P.3d 119.
[18] Thompson, 102 Wash.2d at 231, 685 P.2d 1081.
[19] Id. at 233, 685 P.2d 1081; Swanson, 118 Wash.2d at 525, 826 P.2d 664.
[20] 102 Wash.2d 219, 685 P.2d 1081 (1984).
[21] Id. at 221-22, 685 P.2d 1081 (emphasis added).
[22] Id. at 222, 685 P.2d 1081 (emphasis added).
[23] Id. at 233, 685 P.2d 1081.
[24] Id. at 235, 685 P.2d 1081.
[25] 118 Wash.2d 512, 826 P.2d 664 (1992).
[26] Id. at 516, 826 P.2d 664.
[27] Id. (additional emphasis added).
[28] Id. at 525, 826 P.2d 664.
[29] See State v. Stivason, 134 Wash.App. 648, 656, 142 P.3d 189 (2006) ("In construing statutes and court rules, the words `will' and `shall' are mandatory, while words like `may' are permissive and discretionary."), review denied 160 Wash.2d 1016, 161 P.3d 1027 (2007).
[30] See Hill v. J.C. Penney, Inc., 70 Wash.App. 225, 236, 852 P.2d 1111 (1993) ("The handbook is merely a list of rules and regulations, emphasizing Penney's retail philosophy. It does not define Hill's employment contract or discuss discharge policy. It does not spell out specific procedures for employee discharge, discipline, promotion, evaluation, or salary.").
[31] See Trimble v. Washington State Univ., 140 Wash.2d 88, 993 P.2d 259 (2000); Stewart v. Chevron Chemical Co., Ill Wash.2d 609, 762 P.2d 1143 (1988); Drobny v. Boeing Co., 80 Wash.App. 97, 907 P.2d 299 (1995).
[32] 140 Wash.2d 88, 993 P.2d 259 (2000).
[33] Id. at 95, 993 P.2d 259.
[34] Id.
[35] 80 Wash.App. 97, 907 P.2d 299 (1995).
[36] Id. at 102, 907 P.2d 299.
[37] 111 Wash.2d 609, 762 P.2d 1143 (1988).
[38] Id. at 613, 762 P.2d 1143 (emphasis added).
[39] 115 Wash.2d 657, 667, 801 P.2d 222 (1990) (holding that "extrinsic evidence is admissible as to the entire circumstances under which the contract was made, as an aid in ascertaining the parties' intent.").
[40] 102 Wash.2d at 233, 685 P.2d 1081.
[41] Swanson, 118 Wash.2d at 523, 826 P.2d 664.
[42] E.g., Clerk's Papers at 345.
[43] Clerk's Papers at 235, 243.
[44] Clerk's Papers at 235 (emphasis added).
[45] Reply Brief of Appellant at 1.
[46] Clerk's Papers at 245.
[47] E.g., Drobny, 80 Wash.App. at 104, 907 P.2d 299.
[48] Korslund, 156 Wash.2d at 191, 125 P.3d 119.
[49] Clerk's Papers at 74-75 (deposition testimony that Duncan relied on handbook), 133 (acknowledgment of receipt of handbook), 179 (declaring he was familiar with handbook after three years of employment), 353 (understood that he would be reviewed "as every position is reviewed"), 354 (interpreting agreement as providing annual review just like managers job).
[50] Clerk's Papers at 38 (defendant's motion for summary judgment states "then only [sic] provision governing his employment, as everyone agrees, was the handbook and associated policies."), 217 (Letter from Alaska USA's Executive Vice President stating "as you know, the terms of your employment, as well as that of all Alaska USA employees, are clearly and completely documented in the credit union's Employee Handbook and its Personnel Policy Manual.").
[51] 2008 WL 2230768 (W.D.Wash.2008) (applying Washington law).
[52] Id. at *1.
[53] Id. at *3.
[54] We note that citation to unpublished opinions from jurisdictions other than Washington State is allowed "if citation to that opinion is permitted under the law of the jurisdiction of the issuing court." GR 14.1(b). Rosen, a 2008 federal case, is subject to Federal Rule of Appellate Procedure 32.1, which prohibits federal courts from restricting citation to unpublished opinions issued on or after January 1, 2007. Therefore, citation to Rosen is permitted here despite the fact that it has not been published.
[55] Clerk's Papers at 75.
[56] Clerk's Papers at 92, 99.
[57] 91 Wash.App. 493, 957 P.2d 811 (1998).
[58] Id. at 496-97, 957 P.2d 811.
[59] Id. at 501-02, 957 P.2d 811.
[60] Id. at 505, 957 P.2d 811.
[61] Cole v. Red Lion, 92 Wash.App. 743, 751, 969 P.2d 481 (1998) (citing Gaglidari v. Denny's Rests., Inc., 117 Wash.2d 426, 434, 815 P.2d 1362 (1991)).
[62] Govier, 91 Wash.App. at 502, 957 P.2d 811 (citing Gaglidari, 117 Wash.2d at 434, 815 P.2d 1362).
[63] Id.
[64] Swanson, 118 Wash.2d at 519, 826 P.2d 664.
[65] Id.
[66] Clerk's Papers at 218.
[67] Clerk's Papers at 162.
[68] RAP 9.12, to which Alaska USA cites, provides in relevant part: "the appellate court will consider only evidence and issues called to the attention of the trial court." (emphasis added).
[69] 102 Wash.2d 219, 685 P.2d 1081.
[70] Cowiche Canyon Conservancy v. Bosley, 118 Wash.2d 801, 809, 828 P.2d 549 (1992); see RAP 10.3(c).
[71] RCW 19.36.010.
[72] Cascade Auto Glass, Inc. v. Progressive Cas. Ins. Co., 135 Wash.App. 760, 766, 145 P.3d 1253 (2006), review denied, 161 Wash.2d 1012, 166 P.3d 1217 (2007); Sargent v. Drew-English, Inc., 12 Wash.2d 320, 328, 121 P.2d 373 (1942).
[73] Sargent, 12 Wash.2d at 328, 121 P.2d 373.
[74] Cascade, 135 Wash.App. at 768, 145 P.3d 1253 (citing Mayflower Air-Conditioners, Inc. v. West Coast Heating Supply, Inc., 54 Wash.2d 211, 213, 339 P.2d 89 (1959)); see also Mall Tool Co. v. Far West Equip. Co., 45 Wash.2d 158, 273 P.2d 652 (1954).
[75] Govier, 91 Wash.App. at 499, 957 P.2d 811 (citing Ebling v. Gove's Cove, Inc., 34 Wash.App. 495, 499, 663 P.2d 132 (1983)).
[76] Wagner v. Wagner, 95 Wash.2d 94, 103, 621 P.2d 1279 (1980); Rosellini v. Banchero, 83 Wash.2d 268, 273, 517 P.2d 955 (1974).
[77] Clerk's Papers at 266.
[78] 34 Wash.App. 495, 663 P.2d 132 (1983).
[79] Id. at 496, 663 P.2d 132.
[80] Id. at 496-97, 663 P.2d 132.
[81] Id. at 497, 663 P.2d 132.
[82] Id.
[83] Id.
[84] Id. at 498-99, 663 P.2d 132.
[85] Id. at 499, 663 P.2d 132.
[86] Id. at 497-98, 663 P.2d 132.
[87] We note that commentators have observed that The Restatement (Second) of Contracts has abandoned the use of the terms "bilateral" and "unilateral" contracts. According to the Restatement, these definitions have not been carried forward because of doubt as to the utility of the distinction. Restatements (Second) of Contracts § 1 cmt. f. (1981). "The Uniform Commercial Code also avoids using the terms in order to make the application of contract law less rigid." 25 David K. DeWolf & Keller W. Allen, Washington Practice: Contract Law and Practice § 1.5, at 11 (2007). Notwithstanding these developments, we recognize that Washington cases in this area of employment law still use these distinctions to characterize the nature of the employment relationship.
[88] 110 Nev. 503, 874 P.2d 758 (1994).
[89] Id. at 504-05, 874 P.2d 758.
[90] Id. at 505, 874 P.2d 758.
[91] Id.
[92] Id.
[93] Id.
[94] Id.
[95] 45 Wash.2d 158, 273 P.2d 652 (1954).
[96] MacKenzie, 110 Nev. at 508, 874 P.2d 758.
[97] Id. at 507, 874 P.2d 758.
[98] 45 Wash.2d at 161-62, 273 P.2d 652.
[99] Id. at 162, 273 P.2d 652 (citation omitted).
[100] We note that our reasoning here follows that of the majority of jurisdictions. See Duncan v. Office Depot, 973 F.Supp. 1171, 1176 (D.Or. 1997) ("[B]ased on the cases which discuss modification of the terms and conditions by the employer in an at-will employment relationship, no consideration is required for modification of the employment contract."); DiGiacinto v. Ameriko-Omserv Corp., 59 Cal.App.4th 629, 636, 69 Cal. Rptr.2d 300 (1997) ("`[A]n employer ordinarily may discharge an employee for any reason and at any time. It follows that an employer may also modify the employment contract so long as the modification applies only prospectively.'") (quoting Albrant v. Sterling Furniture Co., 85 Or.App. 272, 274, 736 P.2d 201 (Or.Ct.App.1987) (citations omitted)); Stieber v. Journal Pub. Co., 120 N.M. 270, 273, 901 P.2d 201 (Ct.App.1995) ("Under this rule, accepted in the majority of jurisdictions that have considered the problem, an employer's right to terminate an employee at will necessarily and logically includes what may be viewed as a lesser-included right to insist upon prospective changes in the terms of that employment as condition of continued employment.").
[101] RCW 49.52.050(2).
[102] RCW 49.52.070 ("wage claim statute").
[103] Schilling v. Radio Holdings, Inc., 136 Wash.2d 152, 159, 961 P.2d 371 (1998).
[104] Lillig v. Becton-Dickinson, 105 Wash.2d 653, 659, 717 P.2d 1371 (1986).
[105] Schilling, 136 Wash.2d at 161, 961 P.2d 371.
[106] Ebling, 34 Wash.App. at 500, 663 P.2d 132.
[107] Schilling, 136 Wash.2d at 160, 961 P.2d 371 (citing Pope v. University of Wash., 121 Wash.2d 479, 490, 852 P.2d 1055 (1993)).
[108] See id.
[109] Clerk's Papers at 134, 191.
[110] Clerk's Papers at 9.
[111] Pope, 121 Wash.2d at 491, 852 P.2d 1055.