
STATE OF WASHINGTON

2015 AUG 24  AM 9: 3.

# IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

JAMES O'BRIEN,

               Appellant,

      v.

iLOOP MOBILE, INC., LENCO MOBILE INC., and MATTHEW R. HARRIS,

               Respondents.

No. 71307-8-I

DIVISION ONE

UNPUBLISHED OPINION

FILED: August 24, 2015

SPEARMAN, C.J. — After a dispute over wages allegedly owed under a Retention Bonus Agreement, appellant, James O'Brien, sued his employer, claiming breach of contract and a failure to pay wages due under chapter 49.48 RCW. He also sought statutory double damages under ch. 49.52 RCW. On appeal, he challenges the trial court's summary judgment dismissal of his 49.52 double damages claim and its entry of judgment in favor of Respondents on his remaining claims following a bench trial. Finding no error, we affirm.

## FACTS

James O'Brien is the former Chief Financial Officer (CFO) of iLoop Mobile, Inc., a start-up technology company that was acquired by Lenco Mobile, Inc. in late 2011. As the iLoop CFO, O'Brien was paid a salary of $200,000 annually. O'Brien and other key iLoop employees also had retention bonus agreements with iLoop, which entitled them to bonuses if iLoop entered into a "change of

control" transaction in the 12-month period after January 1, 2011. Clerk's Papers (CP) at 429. The purpose of the agreements was to reward key employees for remaining with the company as it prepared for a merger or acquisition.

iLoop considered a number of potential merger candidates during 2011 and eventually selected Lenco. In September 2011, iLoop CEO Matthew Harris gave O'Brien notice that his employment as CFO of iLoop would end upon the closing of a planned merger with Lenco. Harris expressed his commitment to finding a role for O'Brien in the new entity if O'Brien wished to continue his employment with the company.

### Negotiation of O'Brien's Post-Merger Employment

In late October 2011, O'Brien met with Harris and Thomas Banks, Lenco's CFO, to discuss the possibility of O'Brien's employment with the merged entity. After some negotiation on the issues of title, salary, "at will" versus "for cause" employment, and retention bonus, O'Brien was offered the position of vice president of administration for Lenco, with an annual salary of $185,000. CP at 429. Between October 2011 and the closing of the merger, the only post-merger employment O'Brien and Respondents discussed for O'Brien was the position of vice president of administration, and the only salary O'Brien and Respondents discussed in conjunction with any post-merger employment of O'Brien was the salary of $185,000 per year. O'Brien did not take issue with either the proposed title or salary. And he later signed off on a payroll roster for 2012 that listed him as the vice president of administration at an annual salary of $185,000. But O'Brien informed Harris that they needed to resolve other issues related to his

employment agreement, specifically his retention bonus, a severance package and his demand for assurances that he would not be terminated without cause.

On the morning of December 28, 2011, O'Brien was presented with a written offer letter that reflected the vice president of administration job title and $185,000 salary discussed previously. But the letter did not include a "for cause" termination provision or provide for severance pay. The offer letter indicated that "[i]f the terms outlined above ... are acceptable to you, please sign below and return the original. . . ." Exhibit (Ex.) at 56. O'Brien declined to sign it. VRP at 119-20. He also sent an email to Harris on January 9, 2012, in which he renewed his request for a written employment agreement that included these provisions.

<u>Negotiation of O'Brien's Retention Bonus</u>

Simultaneous with their employment negotiations, iLoop and Lenco negotiated a retention bonus agreement with O'Brien. Lenco drafted a proposed Retention Bonus Agreement, which became "'effective as of and contingent upon the Closing [of the merger].'" The agreement provided that O'Brien would be paid a cash retention bonus[1] in four scheduled payments following the merger, but only if he was providing "Services" to Lenco on the specified payment dates. CP at 430. The agreement also contained provisions intended to deter Lenco from taking actions to discourage O'Brien from remaining employed with Lenco on the future bonus payment dates. Specifically, it provided that the bonus payments would be "due and immediately payable in the event the Recipient is subject to an Involuntary Termination." "Involuntary Termination" was defined as "(a) the

---

[1] In O'Brien's case, the total bonus amount was $347,576.34.

3

Recipient's Termination without Cause, or (b) the Recipient's Resignation for Good Reason." CP at 430. "'Good Reason'" for resignation included "'a material reduction in the Recipient's then current salary and/or benefits, unless the salary and/or benefits of all other Recipients of the Company are proportionally reduced at the same time.'" CP at 431. The agreement did not include a definition of the phrase "then current salary." Ex. at 50. O'Brien signed the agreement on December 23, 2011.

Three days later, on December 26, O'Brien and Harris negotiated a revised agreement that contained additional language "that released, absolved, and discharged iLoop, Lenco, and their officers from any and all claims, demands, agreements, contracts, and obligations that Mr. O'Brien 'now owns or holds or has at any time owned or held' against the releases." CP at 432. Although, O'Brien neglected to sign the revised agreement, he does not dispute the trial court's finding that he "agreed to the revised Lenco Retention Bonus Agreement ... on or around December 26, 2011, before the merger between iLoop and Lenco closed. . . ." Id.; see, Brief of Appellant at 15 (acknowledging that "[t]his iteration of the [Lenco Retention Bonus Agreement] ... constituted the final agreement among the parties. . . . In the rush of the merger closing, Mr. O'Brien neglected to sign the final version.")

<u>O'Brien's Post-Merger Employment and Resignation</u>

The merger of iLoop and Lenco closed at the close of business on December 28, 2011, at which time O'Brien's tenure as CFO of iLoop terminated and he immediately assumed the position of vice president of administration of

4

Lenco. VRP at 176-77, 258-59, 273. In his deposition, O'Brien repeatedly represented that his salary as vice president of administration following the merger was $185,000.

The day before closing, Harris sent an email to all of iLoop's U.S. employees informing them that the merger with iLoop was scheduled to close later that week. The email stated that: "**Between now and the end of the year**: There will be no change to your compensation or benefits between now and the end of the year." Ex. 54 at 2. It stated further:

Starting January 1, 2012

**Existing iLoop and Lenco employees, cash compensation**:
Your pay may or may not change. Your manager will provide you with an offer letter that specifies your title, your reporting relationships and your pay. The pay rate specified in the letter will be effective the start of the year.

Ex. 54 at 2.

Consistent with this email, all salary changes related to the merger were delayed until the next payroll period, which began on January 1, 2012. As a result, for the three days between closing of the merger on December 28 and January 1, O'Brien was paid at the $200,000 per year rate he had been earning as chief financial officer of iLoop. Beginning January 1, 2012, however, O'Brien was paid at the rate of $185,000 or $41 per day less than he had been making.

On February 6, 2012, O'Brien emailed a notice of resignation to Harris, who had continued on as CEO after the merger. O'Brien claimed to have "Good Reason" to resign as that term was defined in the Lenco Retention Bonus Agreement, and therefore demanded payment of his remaining retention bonus

amounts. He contended that moving him from the position of CFO of iLoop to the position of vice president of administration for Lenco resulted in a "'material reduction in [Mr. O'Brien's] then current salary' and a 'material diminution of [Mr. O'Brien's] status, position, authorities, duties or responsibilities.'" CP at 433. O'Brien requested that the company cure these "Good Reasons" within 30 days. Ex. at 57. He also expressed his concerns that "iLoop [was] not adequately financed and continuing sales shortfalls [would] eventually result in the company's inability to pay the funds owed [Mr. O'Brien] under the Retention Agreement." Id.

After receiving O'Brien's email, Harris attempted to cure the issues O'Brien identified as giving him "'Good Reason'" to resign. On February 23, 2012, Harris sent an email to O'Brien in which he promised that O'Brien would be reinstated as CFO and his salary would be increased to the level of $200,000 annually. Thereafter, Harris directed iLoop's General Counsel, Rick Ballard, to implement the salary increase and Ballard instructed the payroll department to do so.

On February 24, O'Brien and Harris met in person to further discuss O'Brien's continued employment. It is undisputed that at this meeting O'Brien stated he had no desire to be a corporate officer in the company and, accordingly, the two men agreed that O'Brien would not be reinstated as CFO. Ex. at 26 (Harris's notes from the February 24 meeting). It is also undisputed that after the meeting Harris instructed Ballard to disregard his earlier instructions to reinstate O'Brien in the role of CFO and increase his salary to $200,000. The

parties dispute whether the meeting resulted in an agreement that O'Brien's "good reasons" to resign as asserted in his email had been cured.

## Procedural History

On March 8, 2012, O'Brien's attorney communicated to Harris that the company had failed to cure the events and conditions giving rise to "Good Reason" under the Lenco Retention Bonus Agreement and claimed that O'Brien was entitled to immediate payment of his full retention bonus amounts. When Respondents failed to pay, O'Brien initiated this lawsuit, asserting claims under his 2011 iLoop Employment Agreement and Lenco Retention Bonus Agreement. O'Brien claimed that Respondents' failure to pay bonus amounts as demanded was a breach of contract and a failure to pay "wages" in violation of RCW 49.48.010. O'Brien also alleged that the failure to pay amounts owed under these two agreements was "willful," such that iLoop, Lenco, and respondent, Harris were liable for double damages under RCW 49.52.050 and .070. CP at 428.

The trial court entered summary judgment for Respondents on O'Brien's ch. 49.52 RCW double damages claims and, following a bench trial, entered judgment for Respondents on O'Brien's remaining breach of contract and RCW 49.48.010 wage claims. O'Brien appeals.

## DISCUSSION

### Back Wages Claims

O'Brien and Respondents cross-moved for summary judgment on O'Brien's breach of contract and chapter 49.48 RCW claims for back wages. Following oral argument on the motions, the trial court ruled that summary

7

judgment was precluded by a factual dispute regarding O'Brien's entitlement to payments under the agreement. The case proceeded to bench trial on the breach of contract claim and his ch. 49.48 RCW claims.

O'Brien argues that the trial court's ruling on the summary judgment motions was error and that he was entitled to judgment as a matter of law. But because the ruling was based on a determination that material facts were in dispute and those facts were litigated at trial and resolved by the trier of fact, the ruling is not subject to appellate review. Johnson v. Rothstein, 52 Wn. App. 303, 759 P.2d 471 (1988).

O'Brien also argues that the trial court erred in interpreting the Lenco Retention Bonus Agreement. When interpretation [of a contract] depends on factual determinations such as the credibility of extrinsic evidence or a choice among reasonable inferences to be drawn from extrinsic evidence, we review the fact finder's determinations of such matters for substantial evidence. Berg v. Hudesman, 115 Wn.2d 657, 668, 801 P.2d 222 (1990); cf. Callecod v. Washington State Patrol, 84 Wn. App. 663, 676 n.9, 929 P.2d 510 (1997) (findings of fact are reviewed to determine whether substantial evidence supports them; "review is deferential and entails acceptance of fact finder's views regarding credibility of witnesses and weight to be given reasonable but competing inferences"). Otherwise contract interpretation is a question of law, which we review de novo. Berg, 115 Wn.2d at 668; Keystone Masonry, Inc. v. Garco Const., Inc., 135 Wn. App. 927, 932, 147 P.3d 610 (2006) (absent disputed facts, the

legal effect of a contract is a question of law we review de novo). Dave Johnson Ins., Inc. v. Wright, 167 Wn. App. 758, 769, 275 P.3d 339 (2012).

O'Brien first contends that the trial court applied the wrong legal standard when it considered extrinsic evidence to supply the meaning of an ambiguous term in the Lenco Retention Bonus Agreement. We disagree.

The agreement expressly provides that it is governed by Delaware law. Courts applying Delaware law are "guided by the 'elementary canon of contract construction that the intent of the parties must be ascertained from the language of the contract.'" In re IAC/InterActive Corp., 948 A.2d 471, 494 (Del. Ch. March 28, 2008) (quoting Citadel Holding Corp. v. Roven, 603 A.2d 818, 822 (Del. 1992)). In other words, a court must "attempt to discern the meaning of a contract and the intent of the parties from the language that they used, as read from the perspective of a reasonable third party." Shiftan v. Morgan Joseph Holdings, Inc., 57 A.3d 928, 935 (Del. Ch. Jan. 13, 2012). Contract terms themselves will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language. Eagle Industries, Inc. v. DeVilbiss Health Care, Inc., 702 A.2d 1228, 1232 (Del. 1997) (citations omitted).

However, when a contract provision is ambiguous, extrinsic evidence should be considered to arrive at the meaning intended by the parties. Id. Contract language is not ambiguous simply because the parties disagree on its meaning. E.I. du Pont de Nemours & Co. v. Allstate Ins. Co., 693 A.2d 1059, 1061 (Del. 1997). Rather, ambiguity exists when the provisions in controversy

are fairly susceptible of different interpretations or may have two or more different meanings. E.g., Rhone-Poulenc Basic Chemical Co. v. Am. Motorists Ins. Co., 616 A.2d 1192, 1196 (Del. Super. 1992); accord Twin City Fire Ins. Co. v. Delaware Racing Ass'n, 840 A.2d 624, 628 (Del. 2003)).

The central dispute at trial was whether O'Brien had "Good Reason" to resign under the Lenco Retention Bonus Agreement based on a material and unilateral reduction to his "then current salary." The parties disagreed on the meaning of the term "then current salary," which was not defined in the agreement. As the parties offered two reasonable interpretations of the term, the trial court properly concluded that the term was ambiguous and looked to extrinsic evidence to determine its meaning in concordance with the parties' intent.

Next, O'Brien contends that there was no substantial evidence to support the trial court's findings of fact and conclusions of law regarding his right to accelerated payments under the Lenco Retention Bonus Agreement. We disagree.

At trial, O'Brien argued that he was entitled to accelerated bonus payments based on a material reduction to his "then current salary" imposed by Lenco without his consent. Five conclusions of law, in particular, explain the trial court's interpretation of the "then current salary" language in the Lenco Retention Bonus Agreement as follows:

> 11. Extrinsic evidence, including Mr. O'Brien's sworn deposition testimony, establishes that the parties agreed that Mr. O'Brien would be paid $185,000 to work as Vice President of Administration upon the closing of the merger. Documents

referring to Mr. O'Brien's salary in 2012 as $185,000 are simply payroll projections that accurately state what the parties' anticipated his salary would be in 2012. There was no evidence to suggest that Lenco or iLoop meant such documents as a communication that Mr. O'Brien's salary as Vice President of Administration would be $200,000 for a brief period if the merger happened to close in 2011.

12. Interpreting "then current salary" to mean the $185,000 salary for the Vice President of Administration position is the only interpretation consistent with the parties' purpose in executing the Lenco Retention Bonus Agreement, which was to limit Lenco's total cash payments to iLoop employees, to limit initial post-closing cash payouts to $500,000 for all iLoop employees, to reward Mr. O'Brien for providing "Services" to the post-merger company as Vice President of Administration until January 1, 2013, and to protect Mr. O'Brien from a material reduction in his Vice President of Administration salary.

13. Mr. O'Brien's proposed interpretation of the term "then current salary" to mean whatever his salary was the moment before he experienced a material reduction would make the contract "unusual, unfair, or improbable," as the meaning of the phrase would be unknown and subject to unilateral action by a party, and/or dependent on when the merger closed. In contrast, interpreting "then current salary" to mean the $185,000 the parties had agreed to for the position of Vice President of Administration makes the contract "rational and probable," as it provides a clear mutual understanding of the minimum salary Mr. O'Brien must be paid until January 1, 2013, in order to retain him in that position and protect him from material reductions in that salary.

14. The phrase "then current salary" in the Lenco Retention Bonus Agreement means the $185,000 salary that iLoop, Lenco, and Mr. O'Brien intended that he would be paid as of the closing of the merger in exchange for his employment as Lenco's Vice President of Administration.

15. Mr. O'Brien's "then current salary" of $185,000 was never reduced during the term of the Lenco Retention Bonus Agreement.

CP at 437-38. These conclusions flow logically from the trial court's factual findings, which are, in turn, supported by substantial evidence.

There was undisputed evidence before the trial court that the parties had agreed that O'Brien's position with the post-merger entity would be vice president of administration with an annual salary of $185,000, even though other issues remained to be negotiated. There was also evidence that O'Brien had agreed to continue working in this role and at this salary after the merger, so long as the other issues could be resolved. This evidence included an October 25, 2011 email from O'Brien to Harris in which O'Brien assented to both the vice president title and $185,000 salary for his post-merger employment; the 2012 payroll roster, which O'Brien had signed and which identified him as vice president of administration at a salary for $185,000; and O'Brien's repeated admissions in his deposition that, immediately following the merger with Lenco, his salary was $185,000.

Even in the face of countervailing evidence, this showing was sufficient to persuade a rational, fair minded person that O'Brien was offered post-merger employment as vice president of administration with an annual salary of $185,000; that O'Brien agreed to this post-merger title and salary; and that O'Brien repeatedly admitted that he understood his post-merger salary was $185,000. The trial court's findings to that effect are supported by substantial evidence.

Likewise, substantial evidence supports findings of fact 31, 32 and 34, which state:

> 31. Mr. O'Brien was the only iLoop or Lenco executive involved in payroll processing for the last payroll period of 2011. The payroll department did not implement Mr. O'Brien's **$185,000 salary** change until the January 1-15 payroll period,

> which meant that his **pay** for December 29-31, 2011, was calculated based on his iLoop CFO salary level of $200,000.
>
> 32. As a result of the decision to delay making payroll changes to implement Mr. O'Brien's **current Lenco salary** until the January 1 to 15, 2012 payroll period, Mr. O'Brien was **paid** his **$185,000 salary** plus an additional $41.10 per day for the three days between the closing of the merger on December 28 and January 1.
>
> . . .
>
> 34. Mr. O'Brien's **$185,000 salary** for the Vice President of Administration position was never reduced from December 28, the date on which the merger closed, through his last day of employment on March 8, 2012.

CP at 433 (emphasis added).

As discussed previously, there was substantial evidence to support a finding that O'Brien's post-merger salary was $185,000 per year.

We also reject O'Brien's argument that the trial court improperly distinguished between "salary" and "pay." The former is defined as: "An **agreed compensation** for services—esp. professional or semiprofessional services—usu. paid at regular intervals on a yearly basis, as distinguished from an hourly basis. . . ." BLACK'S LAW DICTIONARY 1537 (10th ed. 2014) (emphasis added). While the latter is defined more broadly as: "Compensation for services performed" and includes "salary, wages, stipend, or other remuneration given for work done." BLACK'S LAW DICTIONARY 1308 (10th ed. 2014).

In this case, the evidence supports only one possible "agreed compensation for services" related to O'Brien's post-merger employment: the annual salary of $185,000 negotiated by the parties. There is no evidence, and O'Brien offers no argument, that prior to his resignation, the parties had agreed

or even discussed that he would be compensated at the rate of $200,000 per year following the close of the merger. Because the additional $41 per day O'Brien received between December 28, 2011 and January 1, 2012 was not agreed compensation, it was not part of O'Brien's salary.[2]

We conclude that substantial evidence supports the trial court's findings of fact 10, 11, 17, 22, 30, 31, 32 and 34. And conclusions of law 11-15 flow logically from these findings. Because the trial court properly concluded that "O'Brien's 'then current salary' of $185,000 was never reduced during the term of the Lenco Retention Bonus Agreement" (CP at 438), it did not err in rejecting O'Brien's claim that he had "Good Reason" to resign and or that he was entitled to accelerated bonus payments under the agreement. Accordingly, we affirm the judgment for Respondents.[3]

## Double Damages Claims

Before trial, the parties filed cross-motions for summary judgment on O'Brien's claims for double damages under chapter 49.52 RCW. The trial court entered judgment for the Respondents, finding, as a matter of law, any failure to pay wages was not willful, as required by the statute. O'Brien argues the ruling was error. We disagree.

---

[2] Because the reduction in O'Brien's pay by $41 per day did not constitute a reduction to his "then current salary," it is unnecessary to address O'Brien's challenge to the trial court's conclusion of law 17, which provided that the reduction in his pay from $200,000 to $185,000 was not a "material" reduction sufficient to constitute "Good Reason" under the terms of the Lenco Bonus Agreement. See, CP at 438.

[3] Moreover, finding no merit in O'Brien's substantive breach of contract and RCW 49.48 claims, we do not reach his claim that the trial court erred in concluding he was barred from asserting the claims under the doctrine of promissory estoppel.

On appeal from an order granting summary judgment, we engage in the same inquiry as the trial court, with questions of law reviewed de novo and the facts and all reasonable inferences from the facts viewed in the light most favorable to the nonmoving party. Christensen v. Grant Cnty. Hosp. Dist. No. 1, 152 Wn.2d 299, 305, 96 P.3d 957 (2004).

RCW 49.52.050 provides:

> Any employer or officer, vice principal or agent of any employer, whether said employer be in private business or an elected public official, who
>
> (1) Shall collect or receive from any employee a rebate of any part of wages theretofore paid by such employer to such employee; or
> (2) **Wilfully** and with intent to deprive the employee of any part of his or her wages, shall pay any employee a lower wage than the wage such employer is obligated to pay such employee by any statute, ordinance, or contract; or
> (3) Shall **wilfully** make or cause another to make any false entry in any employer's books or records purporting to show the payment of more wages to an employee than such employee received; or
> (4) Being an employer or a person charged with the duty of keeping any employer's books or records shall **wilfully** fail or cause another to fail to show openly and clearly in due course in such employer's books and records any rebate of or deduction from any employee's wages; or
> (5) Shall **wilfully** receive or accept from any employee any false receipt for wages;
> Shall be guilty of a misdemeanor.

(Emphasis added). RCW 49.52.070 provides:

> Any employer and any officer, vice principal or agent of any employer who shall violate any of the provisions of RCW 49.52.050 (1) and (2) shall be liable in a civil action by the aggrieved employee or his or her assignee to judgment for twice the amount of the wages unlawfully rebated or withheld by way of exemplary damages, together with costs of suit and a reasonable sum for attorney's fees: PROVIDED, HOWEVER,

That the benefits of this section shall not be available to any employee who has knowingly submitted to such violations.

The failure to pay wages is not "willful" where there is a bona fide dispute as to the obligation to pay. Lillig v. Becton-Dickinson, 105 Wn.2d 653, 659, 717 P.2d 1371 (1986). A bona fide dispute is one that is "fairly debatable;" an employer's genuine belief that it is not obligated to pay wages precludes the withholding of wages from falling within the operation of RCW 49.52.050(2) and 49.52.070. Schilling v. Radio Holdings, Inc., 136 Wn.2d 152, 159, 961 P.2d 371 (1998).

The question of whether the withholding of wages is willful is part subjective, part objective. The employer must have a genuine subjective belief that the wages are not owed. Duncan v. Alaska USA Fed. Credit Union, Inc., 148 Wn. App. 52, 79, 199 P.3d 991 (2008) (citing Ebling v. Gove's Cove, Inc., 34 Wn. App. 495, 663 P.2d 132 (1983)); McAnulty v. Snohomish Sch. Dist. No. 201, 9 Wn. App. 834, 838, 515 P.2d 523 (1973). At the same time, the employer's subjective belief must be "fairly debatable," which is an objective standard. Moore v. Blue Frog Mobile, Inc., 153 Wn. App. 1, 8, 221 P.3d 913 (2009) (citing Schilling, 136 Wn.2d at 161); Ebling, 34 Wn. App. at 502 (finding no bona fide dispute where employer's belief was "arbitrary and unreasonable").

Although the determination of willfulness is ordinarily a question of fact, we have affirmed the entry of summary judgment on the issue of willfulness where the material facts on the issue are undisputed. See, Duncan, 148 Wn. App. at 79; Schilling, 136 Wn.2d at 160.

Duncan is instructive. In that case, an employee signed revisions to the employee compensation plan "under protest," but continued to work for the company. 148 Wn. App. at 80. He subsequently claimed willful withholding, arguing that the revisions signed in protest did not govern his compensation. Id. The trial court concluded that the record was sufficiently clear to show a bona fide dispute about whether, under those circumstances, the employer was permitted to compensate the employee according to the planned revisions for the time the employee worked under protest. Id. As such, the trial court granted summary judgment in favor of the employer on the claims for willful withholding of wages for that period. Id. We affirmed.

Like the employee in Duncan, O'Brien continued working for Lenco after the merger under protest, i.e., agreeing on his new position and salary but disputing other conditions of employment. But because O'Brien was paid more than his agreed salary for the last 3 days of 2011, a bona fide dispute arose over what constituted O'Brien's "then current salary," whether his salary had been materially reduced, and whether he was entitled to accelerated bonus payments. As such, Respondents' failure to pay was not willful and they were entitled to judgment on O'Brien's ch. 49.52 RCW claims.

## Attorney Fees

O'Brien requests an award of reasonable attorney fees and costs on appeal should we reverse the judgment in favor of Respondents on any of his claims, pursuant to RCW 49.48.030. Because we affirm the judgment, we deny his request.

Affirm.

WE CONCUR:

Spearman, C.J.

Appelwick, J.

Cox, J.